IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:14-CV-403

SHAREL FARMER,
        Plaintiff,

   v.

EAGLE SYSTEMS AND SERVICES, INC.;
DATA SOLUTIONS & TECHNOLOGY
(DST), INC.,
        Defendants.

ORDER

      This matter comes before the court on defendants Eagle Systems and Services, Inc.'s ("Eagle") and Data Solutions & Technology (DST), Inc.'s ("DST") motions to dismiss. (DE ## 10, 18.) Plaintiff filed a response to each motion, (DE ## 16, 20), to which defendants replied, (DE ## 17, 22).

## I. BACKGROUND

      Plaintiff Sharel Farmer ("plaintiff") commenced this action on 15 July 2014, alleging retaliation under the False Claims Act, breach of non-delegable duty, negligence, and civil conspiracy by the defendants. (Compl., DE # 1.) Plaintiff amended his complaint the following day, asserting the same claims. (Am. Compl., DE # 4.)

      Defendants are federal contractors that jointly operate an army supply warehouse in Fort Bragg, North Carolina. (Am. Compl., DE # 4, ¶ 4.) Plaintiff worked as an order filler in the warehouse and was jointly employed by defendants. (Id. ¶ 5.) On or about 2 August 2012, plaintiff witnessed Eagle and DST employees Keith Armstrong ("Armstrong") and Angela Calloway ("Calloway") steal night vision goggles from the warehouse and distribute them to another person for personal use. (Id. ¶¶ 8, 10.) The goggles "were federal government property

that had been entrusted to the defendants to manage and distribute in accordance with federal law, rules, regulations, and contracts." (Id. ¶ 8.) Armstrong was a warehouse supervisor and Calloway was a stock clerk. (Id. ¶ 10.)

Roy Fischel ("Fischel"), a project manager for Eagle, required plaintiff to file a written statement describing the theft. (Id. ¶¶ 9-10.) Immediately after plaintiff provided the report, Fischel disclosed the details of the report and the identity of plaintiff to Armstrong and DST. (Id. ¶ 11.) Plaintiff's supervisors and co-workers responded swiftly to his allegation of theft with "numerous incidents of retaliation, ridicule, threats, intimidation and harassment." (Id. ¶ 12.)

The day following his report, Armstrong moved plaintiff's workstation from its place among the workstations of other employees to an isolated position in the entrance walkway. (Id. ¶ 13.) Several times each day, "Armstrong would come into plaintiff's work area and stare at [him] in a threatening manner for minutes . . . ." (Id. ¶ 14.) Plaintiff felt unsafe in this working environment, so he reported the harassment to human resources[1] and requested that he be moved to a work area with a different supervisor. (Id.)

On or about the third week of August 2012, plaintiff was moved to a work area under the supervision of DST operations manager Larry Bullock ("Bullock"), a friend of Armstrong's. (Id. ¶¶ 15-16.) Bullock "verbally chastised plaintiff" for reporting the theft, told plaintiff he would be watching him, forced plaintiff to work in an isolated location, and repeatedly stared at plaintiff in a threatening manner. (Id. ¶¶ 16-17.) Additionally, Bullock issued plaintiff over ten frivolous disciplinary write-ups, all of which McAlpine,[2] a project director, dismissed. (Id. ¶¶

---

[1]Plaintiff does not specify whether his report was made to the Eagle or DST human resources department.

[2]Plaintiff does not identify "McAlpine's" first name, nor whether he was an Eagle or DST employee.

2

19-20.)  Plaintiff requested a copy of the write-ups from McAlpine, who responded, "I can tell that you think you are smart, college boy.  I don't have a copy and if I did I wouldn't give them to you, [sic] I know what you [sic] trying to do."  (Id. ¶ 28.)  Randall Hyde ("Hyde"), also a DST supervisor, threatened to have plaintiff's car towed from the defendants' parking lot for no apparent reason.  (Id. ¶ 18.)

Plaintiff reported the harassment to McAlpine, but his working environment remained hostile.  (Id. ¶¶ 19-35.)  Bullock continued to harass plaintiff by publicly accusing him of drug use, sending plaintiff home for refusing to "pick up trash all day in below freezing weather," and issuing baseless disciplinary write-ups.  (Id. ¶¶ 20-27.)  Plaintiff reported the continuing harassment to Eagle human resources managers Liz Day and Mary Connelly, who, rather than stopping the harassment, "condoned, maintained and ratified [it]."  (Id. ¶ 29.)

Further, while plaintiff was on pre-approved vacation leave on 5 April 2013, he "started getting phone calls from work stating that he was supposed to be at work."  (Id. ¶ 30.)  Upon returning to work the following Monday, a human resources employee told plaintiff that he should have been at work on 5 April 2013, and stated that her office would "find something to stick on [him] and put in [his] file."  (Id. ¶ 31.)

Plaintiff again voiced his concerns to McAlpine, who insinuated that plaintiff had brought the harassment upon himself.  (Id. ¶ 33.)  The harassment continued unabated, with Bullock and Hyde maintaining plaintiff's working space in an isolated area and frequently staring at plaintiff in such an aggressive manner that plaintiff feared for his safety.  (Id. ¶ 34.)  The daily stress, depression, humiliation, and embarrassment "became so unbearable that plaintiff was constructively discharged from his employment on [15 April 2013]."  (Id. ¶ 35.)

## II. STANDARD OF REVIEW

Defendants move to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. This rule permits a court to dismiss an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While fraud claims under the False Claims Act ("FCA" or "Act") are subject to a higher pleading standard under Rule 9(b), Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783-84 (4th Cir. 1999), claims brought under the anti-retaliation provision of the Act need only meet Rule 8's pleading standard in order to survive a 12(b)(6) motion, United States ex rel. Elms v. Accenture, LLP, 341 F. App'x 869, 873 (4th Cir. 2009) (unpublished).

A 12(b)(6) motion should only be granted if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). However, a complaint that proffers only "a formulaic recitation of the elements of a cause of action" with no "further factual enhancement" is insufficient. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007). To survive dismissal, a party must come forward with "enough facts to state a claim to relief that is plausible on its face." Id. at 548. The plausibility standard is met "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). The court must accept as true all well-pleaded allegations and must draw all reasonable factual inferences in favor of the

4

plaintiff.  See Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005); Myan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).

### III.  DISCUSSION

**A.  Plaintiff's False Claims Act cause of action**

Plaintiff alleges that defendants violated the anti-retaliation provision of the FCA by constructively discharging him in retaliation for reporting the alleged theft of government property.  (Am. Compl., DE # 4, ¶¶ 36-47.)  Eagle and DST each argue that plaintiff has failed to state a claim for retaliation under the FCA.  (DE #12, at 5-11; DE # 18-1, at 6-11.)

The FCA seeks to prevent fraud against the federal government perpetrated by "unscrupulous government contractors."  Mann v. Heckler & Koch Defense, Inc., 630 F.3d 338, 342-43 (4th Cir. 2010).  In furtherance of that goal, the Act protects whistle-blowers through its anti-retaliation provision, which states:

> Any employee . . . shall be entitled to all relief necessary to make [him] whole, if [he] is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To state a claim for retaliation under the FCA, plaintiff must allege that 1) he engaged in a protected activity under the Act; 2) his employer knew he engaged in protected activity; and 3) his employer took adverse action against him because he engaged in protected activity.  Mann, 630 F.3d at 343; Eberhardt v. Integrated Design & Constr., 167 F.3d 861, 866 (4th Cir. 1999).

In 2009, Congress amended the anti-retaliation provision of the FCA to, in part, broaden judicial interpretations of "protected activity."  Layman v. MET Labs., Inc., Civil Action No.

5

RDB-12-2860, 2013 WL 2237689, at *7 (D. Md. May 20, 2013.) Significant to the case at hand, Congress intended to protect internal reports of fraud. Id.; Pencheng Si v. Laogai Research Found., Civil Action No. 09-cv-2388 (KBJ), 2014 WL 5446487, at *17 (D.D.C. Oct. 14, 2014) ("[I]nternal reporting of false claims is itself an example of a protected activity that can give rise to an FCA retaliation action." (internal quotations omitted)).  However, to constitute protected activity, a whistle-blower's report must specifically allege fraud on the government, and not just general misconduct.  Layman, 2013 WL 2237689, at *7.  Additionally, an individual engages in protected activity only where "litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility." Eberhardt, 167 F.3d at 869 (internal quotations and citations omitted); see also Layman, 2013 WL 2237689, at *7 (stating that courts continue to apply the "distinct possibility" standard after the 2009 FCA amendments).  The "distinct possibility" standard does not require a plaintiff claiming retaliation to prove an underlying FCA violation.  Mann, 639 F. Supp. 2d at 631.  Rather, the plaintiff must only have a good-faith and reasonable belief that the act he reports gives rise to a distinct possibility of a viable FCA claim.  Id.

Eagle argues that plaintiff did not engage in protected activity because plaintiff's report only identifies Armstrong, *a DST employee*, as the perpetrator of the theft, and, thus, there is no distinct possibility of FCA litigation against *Eagle*.  (DE # 12, at 7.)  In response, plaintiff states that his allegations impose FCA liability on Eagle as well as DST, because his amended complaint alleges that "Eagle and DST employees" committed the theft.  (DE # 16, at 10 (citing Am. Compl., DE # 4, ¶ 8).)  Eagle counters that even if the two companies were joint employers, a theft committed by "rogue employees" does not subject an employer to FCA liability.  (DE #

6

17, at 4.)

DST argues that plaintiff did not engage in protected activity because his internal report alleged only general misconduct by two employees. (DE #18-1, at 7.) It contends that "[t]here is no allegation that DST . . . was engaged in conduct to defraud the Government," and, thus, there is no distinct possibility of FCA litigation against DST. (Id. at 7-8.) In response, plaintiff states that "[h]is conduct fits squarely within the protections afforded by the FCA [a]nti-retaliation provisions." (DE # 20, at 9.) In support of this position, plaintiff cites a report by the Office of the Inspector General of the United States Department of Defense which outlines the pervasive problem of theft of night vision goggles. (Id. at 10-12.) Plaintiff also cites cases in which individuals faced criminal liability for theft of government property. (Id. at 12.)

The court agrees with defendants that plaintiff has failed to adequately allege that he engaged in protected activity because the reported theft does not give rise to a reasonably viable FCA action against either defendant. The court concludes that plaintiff's belief that a simple theft of government property would alone trigger FCA liability is unreasonable. Cf. United States v. Lawson, 522 F.Supp. 746, 752 (D.N.J. 1981) (stating that the FCA was "an inappropriate cause of action" to replace government property lost in a robbery); Hageny v. United States, 570 F.2d 924, 932 (Ct. Cl. 1978) (rejecting the view that simple theft of government property amounts to a claim under the FCA); Robert Salcido, *The 2009 False Claims Act Amendments: Congress' Efforts to Both Expand and Narrow the Scope of the False Claims Act*, 39 Pub. Cont. L.J. 741, 752 (noting that the 2009 FCA amendments "did not convert the FCA into a general theft statute.").

The plaint text of the FCA supports this conclusion. The Act holds liable any person

7

who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
>
> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;
>
> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;
>
> (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government .
> . . .

31 U.S.C. § 3729(a)(1). Plaintiff points to no specific provision of the Act under which defendants would face potential liability based on the alleged theft, and the court finds no textual basis to support such a position. For example, plaintiff makes no allegation that defendants manipulated their inventory records to conceal or misrepresent the theft, nor that defendants caused to be delivered to the government less than all of its property — actions which would fall more squarely under the FCA's liability provision.

The purpose of the Act also supports the court's position. The FCA was "designed to discourage fraud against the federal government." Mann, 630 F.3d at 342. It was enacted to address "overcharges and other abuses" by government defense contractors during the Civil War. United States ex rel. Bunk v. Gosselin World Wide Moving, N.V., 741 F.3d 390, 409 (4th

8

Cir. 2013). The clear focus of the FCA is fraud, not theft. Congress amended the FCA in 1986 and 2009, but did not broaden the Act to encompass simple theft of government property, retaining the Act's original anti-fraud focus. The few courts that have considered whether the FCA sweeps in theft of government property agree. See Lawson, 522 F.Supp. 746; Hageny, 570 F.2d 924. In Hageny, for example, the government contracted with a logging company to remove designated trees from a national forest. 570 F.2d at 932. The government attempted to hold the company liable under the FCA when it discovered that the company had removed more than the authorized allotment of trees. Id. Although this wrongdoing amounted to loss of government property, the court found that construing the FCA broadly enough to encompass this act was unwarranted. Id. In support of this position, the court noted that the company "did not submit in any form, written or otherwise, a 'claim' seeking to recover money or property from the government." Id. The court suggested that the underlying wrong — theft — would not fall under the FCA's prohibitions unless the company sought government approval of the act. Id.

It is unsurprising that a statute principally concerned with discouraging fraud would fail to include theft within its proscriptions, as such acts are readily addressed by criminal provisions in the United States Code. See 18 U.S.C. § 641 (imposing criminal liability for theft of government property). Plaintiff's brief exemplifies this point. Despite his contention that "[t]heft of government property is at the core of the creation of the [FCA]," plaintiff is unable to cite a single case in which a person was held liable under the FCA for theft of government property. (DE # 20, at 14.) Plaintiff cites multiple cases, however, in which a person was held criminally liable for such a theft. (Id. at 12.)

Additionally, this construction of the FCA is consistent with other areas of the law which

9

distinguish between fraud and theft. Unlike theft, fraud requires some element of "deceit, deception, artifice, [or] trickery." United States v. Jones, 471 F.3d 478, 481 (3d Cir. 2005) (internal citation omitted). Congress has recognized this distinction in the Immigration and Nationality Act, Soliman v. Gonzales, 419 F.3d 276, 282 (4th Cir. 2005) ("Congress specifically distinguished fraud from theft."); in the Securities Exchange Act, United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008) ("Theft not accomplished by deception . . . is not fraud absent a fiduciary duty." (internal citation omitted)); and in the context of health care fraud, Jones, 471 F.3d at 481 ("[F]raud is differentiated from theft."). Similarly, theft of government property does not fall within the ambit of the FCA's liability provision unless it is accompanied by making a fraudulent claim, filing a false record, knowingly delivering to the government less than all of its property, or other fraudulent circumstances set out in § 3729(a)(1)(A)-(G).

Plaintiff argues that this conclusion sanctions defendants' philosophy that theft of government property is of trivial concern. (DE # 20, at 14.) The court disagrees. In holding that a simple theft of government property does not give rise to a reasonable possibility of FCA liability, the court concludes only that the FCA does not provide the avenue to address this serious concern. Nor does the court's reading of the statute leave whistle-blowers who report theft of government property unprotected. For example, in North Carolina, an employer who retaliates against an employee for reporting a criminal violation can be held liable under the common law tort of wrongful discharge. See Combs v. City Elec. Supply Co., 690 S.E.2d 719, 725 (N.C. Ct. App. 2010) (a wrongful discharge claim based on termination in retaliation for reporting criminal conduct falls within the public policy exception to the at-will employment doctrine).

10

Based on the foregoing discussion, plaintiff has failed to sufficiently allege that he engaged in protected activity. Accordingly, his retaliation cause of action under the FCA will be dismissed.

**B. Plaintiff's negligence cause of action**

To state a claim for negligence under North Carolina law, a plaintiff must sufficiently allege the existence of a legal duty, breach of that duty, proximate causation, and damages. Little v. Omega Meats I, Inc., 615 S.E.2d 45, 48 (N.C. Ct. App. 2005). Plaintiff contends that defendants committed negligence by "disseminating plaintiff's identity to the supervisor Keith Armstrong." (Am Compl., DE # 4, ¶ 56.) He states that defendants owed him a duty under North Carolina common law to exercise reasonable care with the information he reported, and that disclosing his identity was a breach and "direct cause of the retaliation and harassment" that lead to his constructive discharge. (Id. ¶¶ 56-57.) Plaintiff alleges that he suffered mental distress, lost wages, and loss of other benefits incident to his employment. (Id. ¶ 58.)

Eagle argues that the court should dismiss plaintiff's negligence claim because Eagle had no duty to keep plaintiff's identity secret. (DE # 12, at 13.) Eagle also contends that plaintiff's amended complaint fails to establish that he suffered any damages as a result of the disclosure of his identity. (Id. at 12-13.) Specifically, Eagle states that within two weeks after plaintiff complained about Armstrong's treatment, defendants granted plaintiff's request to be moved to a different supervisor's area. (Id. at 12.) Plaintiff counters by stating that the injury which flowed from the disclosure includes not only the harassment by Armstrong, but all subsequent harassment. (DE # 16, at 16-17.)

Plaintiff also maintains that Eagle was negligent for failing to intervene after being

11

informed of DST employees' harassment of plaintiff.  (Id. at 17-18.)  In support of his position, plaintiff relies on Freeman v. Del-Tile Corp., 750 F.3d 413 (4th Cir. 2014), in which the Fourth Circuit held that, under a negligence standard, an employer could be held liable for third-party harassment under Title VII.  (DE # 16, at 18.)  Eagle states that the underlying harassment by DST employees is non-actionable, and, thus, it was under no duty to stop such actions.  (DE # 17, at 8-9.)  In its motion to dismiss plaintiff's negligence claim, DST adopts Eagle's arguments and further contends that there are no facts showing that DST disseminated plaintiff's identity.  (DE # 18-1, at 11-12.)

As an initial matter, the court agrees with plaintiff that he has adequately alleged that the disclosure of his identity as the source of the report proximately caused all of the harassment he suffered.  However, the court concludes that plaintiff has failed to adequately allege that defendants owed him a duty to keep his identity confidential.  "A duty is defined as an obligation, recognized by the law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks.  Davis v. North Carolina Dep't of Human Res., 465 S.E. 2d 2, 6 (N.C. Ct. App. 1995) (internal quotation and citation omitted). While plaintiff's amended complaint states that "defendants owed plaintiff a duty . . . to exercise reasonable care with the information that plaintiff provided," plaintiff offers no support for the assertion that such a duty is recognized under North Carolina law.  (Am. Compl., DE # 4, ¶ 56.) In Toomer v. Garrett, the North Carolina Court of Appeals found that a state employee adequately alleged that the state — his employer — owed him a duty to keep his personnel file confidential, absent special circumstances.  574 S.E.2d 76, 92 (N.C. Ct. App. 2002).  The court found the source of that duty in Chapter 126 of the North Carolina General Statutes, which

12

"provides criminal penalties for permitting unauthorized access to [personnel] records." Id. Unlike Toomer, the plaintiff in the instant case cites no authority for the proposition that North Carolina law recognizes a duty of an employer to keep confidential the identity of an internal report's source.

Further, plaintiff argues that Eagle had a duty to remedy the alleged harassment once it was on notice that it was occurring. (DE # 16, at 16-17.) However, in support of his position, plaintiff cites only cases in which employers were subject to liability for negligently failing to remedy actionable harassment under Title VII. (Id. at 17-18.) Plaintiff has not alleged harassment under Title VII, and he cites no authority for the proposition that defendants owed him a duty to remedy non-actionable workplace harassment. Because plaintiff has failed to adequately allege that defendants owed him a duty, his negligence claim will be dismissed.

### C. Plaintiff's civil conspiracy cause of action

Under North Carolina law, civil conspiracy is not an independent cause of action, as recovery must be based on an underlying claim of unlawful conduct that defendants agreed to commit. Toomer, 574 S.E.2d at 92 (citing Shope v. Boyer, 150 S.E.2d 771 (N.C. 1966)). If a court dismisses the underlying claim on which the civil conspiracy claim is based, the court must also dismiss the civil conspiracy claim. See Feldman v. Law Enforcement Assocs. Corp., 779 F. Supp. 2d 472, 498 (E.D.N.C. 2011) (dismissing plaintiff's civil conspiracy claim when plaintiff failed to assert "a viable underlying claim for wrongdoing against the conspiracy defendants").

Plaintiff contends that Bullock, Hyde, and Armstrong "acted in concert and conspired to harass and retaliate against [him]" and that Eagle and DST "acted in concert by ratifying the actions of its employees . . . ." (Am Compl., DE # 4, ¶¶ 61, 63.) However, as the court

13

concluded above, plaintiff has not pled a viable retaliation claim under the FCA — the underlying claim on which he bases his civil conspiracy claim. Accordingly, his civil conspiracy claim will be dismissed.

**D. Plaintiff's breach of non-delegable duty cause of action**

Plaintiff has consented to the dismissal of his claim for breach of non-delegable duty. (DE # 16, at 22). Accordingly, this claim will be dismissed.

## IV. CONCLUSION

Based on the foregoing, defendants' motions to dismiss (DE ## 10, 18) are GRANTED, and the Clerk is DIRECTED to close this case.

This 9 January 2015.

　　　　　　　　　　　　　　　　W. Earl Britt
　　　　　　　　　　　　　　　　Senior U.S. District Judge